Case: 1:17-cv-02853 Document #: 57-1 Filed: 08/14/19 Page 1 of 29 PageID #:499

More             randrewfree@gmail.com    Dashboard    Sign Out

# STATES WITHOUT NATIONS

RESEARCH AND COMMENTARY ON STATE EFFORTS TO RESTRICT THE MOVEMENT OF PEOPLE ACROSS
BORDERS, AND ON THE ALTERNATIVES.

---

Showing posts with label **citizenship**.  Show all posts

MONDAY, AUGUST 5, 2019

## Schroedinger's Citizen

**"For the foregoing reasons, the Department is prepared to conclude Juan acquired U.S. citizenship automatically under INA Section 321, 8 USC §1432 on April 26, 1988." -- Memo of July 8, 2019**

links to Juan's memo and previously unreleased State Department Memorandums interpreting 8 U.S.C. 1432 below



courtesy of Wikipedia

On July 8, 2019, the State Department announced that a deported alien was a U.S. citizen and would be issued a U.S. passport.  Juan had been waiting for this news for thirty years, over a decade of them in exile from his home and family.

Juan was born in Colombia.  When he was two years old he moved with his parents to Miami as a legal resident.  In 1987, when he was 11, Juan's mother naturalized.  Shortly thereafter his parents divorced. Juan received a notice from US Citizenship and Immigration Services giving him an appointment slot for receiving his Certificate of Citizenship.

Juan figured the government set up the appointment for his Certificate because the official who organized his mother's naturalization knew she had a son and the son was a legal resident and had derived U.S. citizenship via his mother's naturalization.  (Juan's brother was born in the United States and his father was a legal resident who did not naturalize.)

Juan showed up at the federal building in Miami with a relative, but his name was not on the list.  He showed his appointment card to an official.  She asked to see his mother, who was not with him. He went home and figured they'd sort it all out later.

After Juan turned 18 he submitted an N-400.  And then another, and another, and another. He told me, "Apparently for some odd reason my A-file never left its repository.  The INS officials could never give me a clear explanation of what went wrong."  (An N-400 is the form for legal residents who want to become naturalized U.S. citizens.  You have to take a civics test most people born here would flunk and go through a criminal background check.  If you are already a U.S. citizen, as the State Department now recognizes was the case for Juan, it's like completing the coursework through the twelfth grade with passing grades and then signing up for the G.E.D. instead of just filling out the

RSS Subscribe in a reader

SUBSCRIBE VIA EMAIL

Subscribe to States without Nations by Email

DEPORTATION INTELLIGENCE

Professor Jacqueline Stevens, Political Science and Legal Studies, Northwestern University

Deportation Research Clinic

Bender's Immigration Bulletin

National Immigrant Justice Center

Detention Watch Network

LABELS

287(g) (1)
academia (27)
activism (3)
adoption (1)
AlQaeda (1)
Andre Joseph (1)
Andres Robles (12)
Anthony Chiu (1)
Atlanta Immigration Court (19)
borders (3)
California (1)
CBP (1)
Chao Chen (1)
Chao Chen v. GEO (5)
chicago courts (3)
citizenship (50)
citizenship deportation ICE dhs israel (1)
citizenship nationality (1)
civil rights (6)
civil war (1)
community (1)
Dalit (1)
Dallas Immigration Court (1)
Danard (5)
David (2)
democracy (1)
Denver Immigration Court (1)

paperwork for your diploma, the equivalent of which for a Certificate of Citizenship is the N-600.)

In 1996, when Juan was 21, Drug Enforcement Agents nabbed him for transporting $275,000. They released him after the confiscation of the currency.

Juan obtained a degree in Electronics and Engineering Technology in 2002 and worked in that industry until 2006, when he once again attempted to procure his Certificate of Citizenship through an N-400. The examiner explained that he also was eligible for "derivative citizenship." Juan says:

> I had no idea what she meant by the terms 'derivative citizenship,' so I just told her to proceed with the N-400. Out of all the mistakes that the government has made, this seems to me by far the most crucial and devastating. The examiner should have went through the path of derivative citizenship and not offer me another option.

The 2006 visit to the federal building entailed fingerprinting. This alerted the feds to Juan's prior arrest and upon leaving the examiner's office he was charged with money laundering and taken into custody.

Juan served his sentence of one year and one day, reduced by the judge from the plea deal he had accepted for four years.

In December, 2006, Juan was driven five hours from an ICE facility in New Mexico to the El Paso Processing Center. He told me that in the courtroom, before the hearing officer arrived, the ICE attorney "approached us and said 'Hey, Juan, I know you're a U.S. citizen. I have all the evidence and you satisfy the conditions. I'm not going to object to the evidence you provided. The last thing I need is a civil suit for deporting an American citizen.'"

But a few minutes later, the hearing officer, Thomas Roepke, ordered Juan deported. "The IJ claimed that I was removable due to the fact that my mother did not have sole legal custody. My lawyer, the DA [ICE trial attorney], and myself were shocked to hear the outcome."

Juan remained only a month in Colombia. "I feared for my life. My mother was kidnapped in Buga, 1997." Juan still does not know what became of her. "Her husband was found dead about two weeks later." Juan moved to Germany with his brother, who was in the U.S. Army.

A few weeks ago Juan received a phone call from the U.S. Embassy in Madrid. A consular official told him, "Things have changed, Juan, for the better." Soon after, Juan obtained his U.S. passport.

The State Department's analysis lays out how this happened. It is a model of legal clarity. The official quotes from the relevant case law, administrative decisions, and memorandums on derivative U.S. citizenship. Juan wanted me to post the letter in its entirety because he knows it will help many others who find themselves in this situation. (It will be especially helpful to folks in the Eleventh Circuit who were under 18 when just one parent naturalized and their parents divorced and had joint custody.)

Ambiguous Categorical Representations

"Schroedinger's Cat" is a thought experiment created in 1935 by physicist Erwin Schroedinger to illustrate what he claimed was the paradoxical absurdity of a potential condition that simultaneously has two mutually exclusive attributes, e.g., a cat being alive and dead. Citizenship law reflects this. At any given point one either is or is not a U.S. citizen. And yet, consider the following regulation:

> An alien whose claim to lawful permanent resident, refugee, asylee status, or U.S. citizen status cannot be verified will be advised of the penalties for perjury, and will be placed under oath or allowed to make a declaration as permitted under 28 U.S.C. 1746, concerning his or her lawful admission for permanent residence, admission as a refugee under section 207 of the Act, grant of asylum status under section 208 of the Act, or claim to U.S. citizenship. A written statement shall be taken from the alien in the alien's own language and handwriting, stating that he or she declares, certifies, verifies, or states that the claim is true and correct. From 8 CFR § 235.3 - Inadmissible aliens and expedited removal.

Of course if "the alien" is a U.S. citizen, then a U.S. citizen is verifying her U.S. citizenship. Like Schroedinger's cat, the alien of the regulation may be a citizen, and not even a dual citizen, in the case of those who

deportation (39)

DHS (41)

E-verify (1)

Edward Bloodworth and Stephanie Cho (1)

Eikenberry (2)

El Centro (1)

Eloy Detention Center (10)

EnglishOnly (2)

EOIR (36)

Esteban Tiznado (12)

ethnicity (3)

falk (1)

fascism (3)

Film (1)

Florence Detention Center (13)

florence immigration court (3)

FOIA (20)

Frank Serna (3)

genetics (3)

genocide (1)

George Ibarra (5)

Guzman (16)

Hardin (1)

Houston CCA (1)

ICE (72)

ICE deporting US citizens (103)

IDENT (4)

immigration (6)

immigration citizenship (1)

immigration citizenship deportation (1)

in absentia (1)

inheritance (2)

IraqWar (11)

israel (11)

Jewish (2)

Jhon Ocampo (1)

Johann Francis (3)

Joseph Anderson (3)

Kafka (1)

Kennedy (1)

lawsuits (21)

liberalism (1)

Lorenzo Palma (2)

Mark Lyttle (29)

marriage (7)

Masri (1)

MatterOfCB (1)

Menocal et al. v. GEO (8)

mexico (2)

Michael Klein (2)

military (3)

misconduct (14)

nationality (12)

NationArticleFacts (13)

are born in the United States and have been deported, such as Pedro Guzman, Mark Lyttle, and Roberto Dominguez.

Subsequently, philosophers argued such a scenario was not at all absurd.

Paradoxes about knowledge are abstract. The legal analysis of the meticulously documented 13-page single-spaced memorandum is concrete:

> Although the Property Settlement Agreement attached to the final Order of Dissolution provides for 'shared parental responsibility' for the children (Juan and his sibling), which falls afoul of the sole legal custody requirement announced in Bustamante-Barrera, 1) the Department maintains that the legal custody requirement of former INA 321(a)(3) is satisfied even if the parents are awarded joint custody (See TABS 11 and 16); and 2) two DHS/USCIS Administrative Appeals Office (AAO) opinions (albeit one non-precedential) have since concluded that Bustamante-Barrera does not apply in the 11th Circuit which is where the events giving rise to Juan's citizenship claim under INA 321 took place (specifically, Juan's mother's naturalization, the dissolution of the marriage of Juan's parents and Juan thereafter residing as a legal permanent resident with his mother in Florida after the dissolution of his parents' marriage on April 26, 1988 when he was 12 years old.

TAB 11 refers to a 1996 State Department Passport Memorandum 96-18. The Memorandum suggests that the interpretation of custody by the Department of State goes back to the previous version in 1993.

> Legal Custody
> The Department has not changed its interpretation of what constitutes 'legal custody[.]' As stated in the referenced Bulletin, in cases where the divorce or separation decree does not specify who has custody and the naturalized parent has physical custody, the child can be documented as a citizen under Section 321(a)(3) provided that all other conditions of the law are met. Section 321 does not require sole or exclusive legal custody. If the parents have a joint custody decree, then both parents have legal custody. Thus, the naturalization of either parent would be sufficient to satisfy the Section 321(a)(3). If there is a specific question about the sufficiency of legal custody evidence, OCS, PPT and INS agree that we should review the matter on a case by case basis. (Emphasis added.)

As State notes in its recent memorandum, this interpretation since 1993 conflicts with the decision in Bustamante-Barrera v. Gonzalez, 447 F.3d 388 (5th Cir. 2006).

One thought would be that the statutory interpretation of the Fifth Circuit supersedes an agency. The agency seems to concede this is the case for the Fifth Circuit and the Ninth Circuit, which cited Bustamante-Barrera and decided similarly in U.S. v. Suchite-Casola 670 F. 3d 1023 (9th Cir. 2012). Memo pp. 5 - 7.

Bustamante-Barrera did not consider the State Department Passport Memorandum. Suchite-Casola did:

> We must conclude that the non-precedential, BIA statutory interpretations are not worthy of any deference, because they conflict with the words and obvious meaning of the statute. See Simeonov v. Ashcroft, 371 F.3d 532, 535 (9th Cir.2004) (refusing to grant any deference when the agency decision was "contrary to the plain and sensible meaning of the statute" and would lead to an irrational result). Indeed, the only authority cited by the BIA from the time § 1432(a) was in effect is an unpublished 1996 Passport Bulletin issued by the State Department, an agency that does not enforce these immigration laws. The BIA's additional reliance on regulations later adopted by the Department of Homeland Security to implement the CCA is unpersuasive, because the CCA superseded the controlling statute in this case. Rather than follow unpublished, BIA decisions unworthy of deference, we instead give the statute a sensible interpretation and thereby agree with the only circuit decision that has addressed this issue, the Fifth Circuit's decision in Bustamante-Barrera, 447 F.3d at 395-96.

A couple thoughts. First, the authority for this interpretation is not solely the 1996 Passport Bulletin. As quoted above, the 1996 Bulletin actually references back to an earlier version of the Bulletin, from

nativism (17)

nyc (1)

Obama (1)

ORR Age Assessments (1)

PoliticalScienceOpEd (3)

politics (2)

prisons (7)

Private Prisons (18)

property (1)

queer (4)

race (5)

racism (1)

Radical Information Project (1)

Reid (1)

religion (2)

Robert Dominguez (3)

Robinson Martinez (2)

Russell Sage Foundation (1)

s. 1639 (1)

s.1348 (12)

s.1639 (4)

slaving wages (5)

SRA International (2)

Stevens v. Holder et al. (9)

Stewart Immigration Court (4)

subfield offices (5)

tenth circuit (1)

torture (2)

UAE (1)

untouchables (1)

uscis (3)

varick lock-up (4)

war (5)

Washington A.G. v. GEO (4)

WMDs (1)

ABOUT ME

JACQUELINE STEVENS

Professor, Political Science Department, Northwestern University. I teach political theory and write about law-breaking by ICE and the immigration courts for The Nation magazine. My book States without Nations: Citizenship for Mortals was published by Columbia University Press in 2009. It explores alternatives to our current laws that base citizenship on parochial, unjust ideas about birth, and shows how these laws are connected to other archaic practices inconsistent with liberalism, including inheritance and marriage. My first book was Reproducing the State (Princeton, 1999). For contact and other

1993.  The State Department also reiterated this policy in 2013.  In other words, on at least three separate occasions State Department staff have interpreted the statute consistent with the plain text and to align with the needs of U.S. citizens.  This is the agency that is doing the hands-on work of implementing the law.  Typically judges defer to such practices unless they are clearly at odds with the text or absurd.  The State Department interpretation is neither.

Here is the text in dispute.  It indicates that if the following criterion is met, a child under 18 who entered as a legal resident automatically derives U.S. citizenship by operation of law.

> (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents...

Juan's mother naturalized.  Shortly thereafter his parents legally separated.  His mother had physical and legal custody of him, though it was joint legal custody.  The judges claim that State Department interpretation "conflict[s] with the words..." but the plain text does not support this claim.

Second, which interpretation is irrational?  One that separates U.S. citizen parents from their children, and siblings from each other, or one that keeps them together?  The judges in Buastamante-Barrera  and Suchite-Casolaare are considering Schroedinger's citizens, i.e., the uncertainty and ambiguity of citizenship status, to be the "irrational result." The State Department officials are saying that what's really irrational is creating certainty by killing the cat.  To avoid this, the State Department is interpreting the law such that people who could be U.S. citizens - the law's plain text does not require sole custody of the naturalizing parent - are U.S. citizens.

Third, as a matter of law,  Suchite-Casola seems to misstate the division of labor between the State Department and Homeland Security.  To the extent that Homeland Security enforces immigration law, as the Ninth Circuit opinion notes, it does so based on a prior finding of who exactly is a U.S. citizen. If the State Department and U.S. Citizenship and Immigration Services use criteria to define a U.S. citizen, then to enforce the law means not deporting U.S. citizens, and does not empower the agency to invent its own criteria.  If the courts are going to defer to any agency's interpretation of U.S. citizenship for those who are foreign-born, then it should be first to the State Department and then U.S Citizenship and Immigration Services.

Now that the cat is out of the bag, what happens next?  One thought is that many other wrongfully deported U.S. citizens will be able to make use of the State Department analysis here.  Another is that Trump apparatchik Mike Pompeo will want to deprive as many people as possible their U.S. citizenship and change the directive, even if it means a soldier in the U.S. army cannot live near his older brother, and the reversal is at odds with over 25 years of policy, and prompt court challenges on several grounds, including for violating the Administrative Procedure Act.

Is the irrationality in U.S citizenship statutes their ambiguity, or that racist governments weaponize our complex biographies for scurrilous political agendas?  It is easy to be distracted by the confusion of birthright citizenship laws and their shifting standards of evidence.  Juan's ordeal persisted under the presidencies of Ronald Reagan, Bill Clinton, George Bush, Barack Obama, and Donald Trump, under whose leadership Juan finally was declared a U.S. citizen.

The real problem is birthright citizenship itself, jus sanguinis and jus soli, that is, the discrepancy between a citizenry produced capriciously through narratives of family history, birth, and lines in the sand irrelevant to good governance and a citizenry of those who distinguish themselves by vows to uphold the rule of law.

POSTED BY JACQUELINE STEVENS AT 08:21   NO COMMENTS:
LINKS TO THIS POST

LABELS: BORDERS, CITIZENSHIP, ICE DEPORTING US CITIZENS

THURSDAY, JULY 12, 2018

### ICE Turning U.S. Citizens Over to DHHS? Are Those under Five of "Unknown Parentage" U.S. Citizens?

information, please go to jacquelinestevens.org.

VIEW MY COMPLETE PROFILE


Add to Technorati Favorites

S. 1639: BILL TO PROVIDE COMPREHENSIVE IMMIGRATION REFORM AND WITH OTHER PURPOSES

BLOG ARCHIVE

▼ 2019 (6)
  ▼ August (1)
    Schroedinger's Citizen
  ► July (2)
  ► March (1)
  ► February (1)
  ► January (1)
► 2018 (11)
► 2017 (8)
► 2016 (6)
► 2015 (5)
► 2014 (12)
► 2013 (15)
► 2012 (19)
► 2011 (18)
► 2010 (36)
► 2009 (35)
► 2008 (40)
► 2007 (59)

Blogroll Me!



A reporter from Buzzfeed, Amber Jamieson, brought to my attention a passage from today's Declaration indicating that at least one U.S. citizen may be in the custody of Department of Health and Human Services.

Her article states:

> A child under the age of 5 remains detained by the federal government after being separated from their parent at the US–Mexico border more than a year ago, even though they may be US citizens [sic].

8 CFR 1240.8 says that burden on the government to prove by "clear and convincing evidence" that someone put into removal proceedings is indeed an alien.

Today's declaration states:

> One child on the original list has a parent who may or may not be a United States citizen (insufficient information is available to make this determination, and the parent and others are not available to provide that information). The child was separated from her parent in 2015 when her parent was arrested on an outstanding warrant by the U.S. Marshals Service. Defendants have not been aware of the parent's location since then and they remain unable to locate that parent.

A child in a class of those under 5 years old and taken into custody in 2015 could have been no more than 2 years old at the time of the separation. If that child has been incommunicado from any relatives, then the child would have no information on where she was born. Assuming that the child had no identification at the time her parent was arrested on an outstanding warrant -- which implies that the parent had been living in the U.S. for enough time to accumulate an outstanding warrant -- then it seems not only unlikely that ICE would have evidence of the child's alienage but also likely that the child was born in the United States.

What happened to this parent? The U.S. Marshals could find the parent because of an outstanding warrant but a judge's order to do so leaves them coming up short?

"Foundling" Law

Another possible scenario is that the government does not know who the child's parent even is. This has been broached in some cases but I have not heard anyone make the point that each and every one of such individuals is by law a U.S. citizen.

According to 8 USC 1401, "The following shall be nationals and citizens of the United States at birth":

> a person of unknown parentage found in the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in the United States.

In short, the U.S. government can collect all the DNA that it wants, but if they cannot match the children with a known parent, and cannot prove they were not born in the United States, then these children are effectively of "unknown parentage found in the United States" and they all are legally U.S. citizens at birth.

UPDATE 9:15 pm: Amber Jamieson posted on Twitter stating that ICE says the possible US citizen parent in question presented herself and her son "born in Mexico" at the border in 2015 and that she was then taken into custody because of an outstanding warrant. Once more a credible journalist repeats ICE's claims without a shred of evidence or verification. If ICE has hard evidence of this, why wasn't it in the Declaration, one necessary to show compliance with a court order? Why not release the documents? The same government that claims it cannot now locate the mother expects, alas correctly, a compliant media will reprint their assertions about her background, just because they said so.
Why are reporters continuing to print statements from official ICE-dom when that agency has been demonstrably lying about US citizens detained and deported for decades? Maybe this time ICE is right but the media is supposed to print the truth that it has verified, and not amplify whatever propaganda the government feeds them.

POSTED BY JACQUELINE STEVENS AT 16:35   NO COMMENTS:
LINKS TO THIS POST
LABELS: CITIZENSHIP, ICE DEPORTING US CITIZENS

---

FRIDAY, MAY 18, 2012

## Citizenship To Go



Today's opinion piece in the New York Times provoked e-mail to me I wanted to share:

```
Dear Professor Stevens,

I completely agree with your article "Citizenship to go".

I've lived most of my adult life in the US, having moved
here as a
graduate student in 2001. I bought a house, had a child
born here, pay
my taxes, have a retirement plan, etc. All 100% legal. Yet
I'm not
even a "permanent resident" yet. I can apply next year,
and become a
citizen several years after that. It is quite possible
that someone
born in the US or to American parents in 2001 will be able
to vote
before I do. Where's the logic in that?

I even get jury duty notices, and each time I have to go
to extra
trouble to prove that I'm not eligible to serve. This is
always a
painful reminder of my second-class status.

I understand you may get hundreds of letters about your
op-ed, so I
don't expect a reply. I just I wanted to get this off my
chest. I hope
you don't get a lot of hate mail.

Best,
Ivan   "Temporary visitor" to the US
```

Of course Ivan most likely would be a fine juror in his community. In light of the problems enlisting participation on juries or even voting, this is perhaps more reason to put Ivan's time to good use on a a jury and not fighting government bureaucracy.

From my colleague Jeff Rice in the History Department:

> [Y]our column today... reminded me of an interesting anecdote about Thomas Mann. After becoming an enemy of the Nazi regime he took off to Czechoslavakia and then to England acquiring citizenship along the way. After that he came to L.A. and took US citizenship and then, when called before HUAC he took off for Switzerland for the remainder of his life (suggesting that he left Germany in the name of freedom and he would leave the US in the name of freedom). One of his detractors denounced him for changing citizenship as often as he changed his clothes. Personally, I always admired Mann for his cosmopolitanism.

Here's a link to the book behind the opinion piece.

---

POSTED BY JACQUELINE STEVENS AT 07:24   2 COMMENTS:
   LINKS TO THIS POST

LABELS: ACADEMIA, CITIZENSHIP

---

THURSDAY, MAY 10, 2012

## "Citizenship-In-Question: Evidentiary Challenges"



Below is a link to the conference report for

"Citizenship-In-Question: Evidentiary Challenges for Jus Soli and Autochthony, from Authenticité to 'Birtherism'"

Scholars convening at the Boston College Law School April 19 – 21, 2012 presented rich, fascinating papers focused on struggles over ascertaining citizenship claims across regions. Through the above report, the conference organizers, Dan Kanstroom, Benjamin Lawrance, Rachel Rosenbloom, Rogers Smith and I wanted to alert our colleagues to this important work in progress.

POSTED BY JACQUELINE STEVENS AT 11:02   NO COMMENTS:
   LINKS TO THIS POST

LABELS: ACADEMIA, CITIZENSHIP, ICE DEPORTING US CITIZENS

---

WEDNESDAY, JUNE 9, 2010

## U.S. Border Patrol Kills Mexican Teenage Stone Thrower Protesting the Occupation



☐ The map shows El Paso belonging to Mexico until the mid-nineteenth century, when the U.S. government acquired sovereignty after invading Mexico City. (It is taken from a Latin American Studies web page that has several excellent maps on the land grab.)

Today's Los Angeles Times features an AP story "Border Patrol in El Paso kills Mexican teen":

> Preliminary reports on the incident indicated that U.S. officers on bicycle patrol "were assaulted with rocks by an unknown number of people," Border Patrol Special Operations Supervisor Ramiro Cordero said Tuesday.

The article connects this violence with the U.S. government's targeted and deadly electrocution of someone walking across the border in California:

> Less than two weeks ago, Mexican migrant Anastasio Hernandez, 32, died after a Customs and Border Protection officer shocked him with a stun gun at the San Ysidro border crossing that separates San Diego and Tijuana, Mexico. The San Diego medical examiner's office ruled that death a homicide.

The article offers a compassionate portrait of the death's impact on the teenager's family. But, resembling coverage of similar events in Israel-Palestine, the reporter quotes extensively from the U.S. government explaining its armed presence in the area and provides no response from political and religious organizations challenging this.

Of course the real problem is not the unrecognized principle of Mexican or any other nation's sovereignty, but unrecognized principles of justice that require free movement and thus the elimination of birthright citizenship.

----

For a more balanced story, including an eyewitness challenging the Border Patrol version of events, listen in to NPR's Monica Ortiz Uribe on "All Things Considered."

POSTED BY JACQUELINE STEVENS AT 08:01   NO COMMENTS:
LINKS TO THIS POST

LABELS: BORDERS, CITIZENSHIP, ISRAEL, MEXICO, WAR

---

FRIDAY, MAY 28, 2010

## ""I was just profiled" -- CNN story on False Imprisonment of Chicago Man



Yesterday CNN news writer Tom Watts put together a great story revealing once again the inanity of deportation laws and the illegal actions they precipitate.

According to the article, Eduardo Caraballo's mother was not allowed to bail him out of a Chicago jail for a stolen car charge because of an ICE hold. But Mr. Caraballo was born in Puerto Rico, and is legally a U.S. citizen by birth, and therefore protected by law and the Fourteenth Amendment from the handcuffs of ICE.

According to the CIA World Factbook, Puerto Ricans were "granted U.S. citizenship in 1917."

ICE has no authority over anyone who is a U.S. citizen by birth, including those born in Puerto Rico. It can only justify arresting someone who makes a claim of having this status if it has proof that the person is lying, and, in this case is from Mexico. Absent such proof, and therefore legal authority, the ICE and jail officials responsible for this are violating not only Mr. Caraballo's civil rights but are also committing serious crimes of kidnapping and false imprisonment.

Further evidence that this is happening around the country, mostly through the Criminal Alien Program, recently came my way in ICE's reply to a FOIA request I submitted in March.

In just the last few months ICE HQ provided guidance to ICE attorneys concerning about 1500 people issued ICE detainers who asserted they were U.S. citizens.

POSTED BY JACQUELINE STEVENS AT 05:51   NO COMMENTS:
  LINKS TO THIS POST  ✉

LABELS: CITIZENSHIP, ICE DEPORTING US CITIZENS, LAWSUITS

---

TUESDAY, MAY 25, 2010

## The Theory and Practice of Immigration Detention Workshop: Some Comparisons



Manor Road Building, site of Friday's detention workshop

Last Friday (May 21) two Oxford University graduate students --

Stephanie Silverman (Politics and International Relations) and Evelyn Massa (Sociology) -- hosted an unusually fabulous workshop, The Theory and Practice of Immigration Detention.

It turns out that Oxford has three vibrant centers devoted to immigration studies: The Refugee Studies Centre, The Centre on Migration Policy and Society (COMPAS), and the International Migration Institute. Drawing on the support of the first two, Ms. Silverman and Ms. Massa brought together researchers and advocates from across Europe to present cutting-edge findings.

A few tidbits I thought especially interesting:

1) No Detention Regulation in England = Guards Committing Assault. In response to my mentioning during a Q and A that the U.S. holds people in immigration jails without any regulations, an eminent British immigration rights lawyer, Frances Webber, took me aside during a break and described a similar discovery she had made in 1997, following upheaval at the Campsfield detention center, just outside Oxford. The government was charging the people in their custody with various crimes associated with a riot.

Not only did the video footage reveal it was the guards who had been smashing the televisions (and the people in the centers) but the lawyers asked the government, how, absent regulations, could the government use any force at all?

Without regulations, Ms. Webber explained to the government attorneys, any use of force by a guard constituted an assault. The government lawyers' tacit agreement with this observation was suggested by the fact that they quickly drafted regulations authorizing, and also constraining, the government's use of force in immigration detention centers.

(Also, the prison industrial complex from the US is alive and well in England: the UK's Campsfield web page lists the The GEO Group Ltd as the center's contractor; the GEO Group is also a contractor for many of the large ICE facilities.)

2) Differentiated Detention Centers.
In the U.S., Immigration and Customs Enforcement (ICE) houses people from various criminal backgrounds in the same jails and people are distinguished within them by different colored uniforms and may or may not be segregated into different sleeping areas. This system seems designed to maximize the flexibility of bed space.

In the UK, there are different levels of detention security and these vary by criminal background. In all the centers, the visits are open, not via telephones across windows, and the guards control movement by affixing wristbands to the visitors.

Some facilities are "open" so that the detained may come and go, and even at the closed facilities, people wear their own clothes. Also, at all facilities in England people may use their own cell phones and the internet.

Not surprisingly, escapes happen. But England seems willing to tolerate this as the price of avoiding collective punishment, the effect of housing noncriminals in the conditions of penal incarceration, and worse, used in the United States.

(Joseph Anderson, someone who appears to be a US citizen and has been held at the Arizona Pinal County Jail by ICE for over two years, recently told me that in the same jail people with criminal convictions have outdoor recreation each day but those in the ICE wing are lucky if they are allowed out for an hour once a week.)

3) UK Bribes Foreign Governments.
A lawyer who testifies as an expert witness on behalf of Iranians fearing persecution if they return told me that he had recently prevailed in a FOIA request and learned that the UK was paying Nigeria 250 Euros per deportee for the purpose of obtaining travel documents. Another participant mentioned an individual who was seeking asylum from Somalia and had originally entered with Gambian papers. Despite no connection to Nigeria, the UK deported him there.

4) Less Transparency in the U.S.
England has a Freedom of Information Act but the courts there are much more likely than they are here to defer to the government's reluctance to release policy or statistical information.

For instance, the government's response to a Parliamentary inquiry was to assert "diplomatic relations" as an excuse not to release data on

the numbers of criminals with life sentences being deported to respective countries:

> **Mr. Grieve:** To ask the Secretary of State for the Home Department how many prisoners from (a) Ireland and (b) each other European Economic Area country serving mandatory life sentences have been deported or removed in each of the last five years. [320071]

> **Mr. Woolas** [holding answer 2 March 2010]: Since 2007, the UK Border Agency has removed or deported over 15,000 foreign national offenders. Of those removed or deported, less than three in every thousand previously served a mandatory life sentence.

> Information from before this period could be obtained only by reviewing individual records. This would be a disproportionate cost.

> As a general rule, it is our policy not to disclose the volume or characteristics of those removed to specific countries as it would jeopardise our diplomatic relations.

The above is quoted from a Parliamentary web site that contains other interesting exchanges on British deportation practices.

If you want more information on UK deportation data, this is the government website with that information.

Presentations.
The presentations ran the gamut and without striking a wrong note, from applying Giorgio Agamben's theories to Italian detention centers (rumored to be Europe's worst) to a British physician's grim and thorough review of detainee medical care. The presenters and their talk titles are here.

(Also, I just learned that "run the gamut" refers to the medieval scale, which is pretty perfect for presentations about medieval government practices. Here's what the American Heritage Dictionary says:

[Middle English, the musical scale, from Medieval Latin gamma ut, low G : gamma, lowest note of the medieval scale (from Greek, gamma; see **gamma**) + ut, first note of the lowest hexachord (after ut, first word in a Latin hymn to Saint John the Baptist, the initial syllables of successive lines of which were sung to the notes of an ascending scale CDEFGA: Ut queant laxis resonare fibris Mira gestorum famuli tuorum, Solve polluti labii reatum, Sancte Iohannes).])

Let's Drink to That!



After the workshop a bunch of us headed off to a nearby pub, The King's Arms (absolutely incredible fish and chips!) and I was able to hear more about the really interesting research the graduate students are doing, including in-depth case studies of foreign nationals in England's prisons undertaken by a U.S. student who hails from Legal

Aid work in New York City. (It appears as though there is a lot more fluidity between the criminal and immigration incarceration policies compared with the U.S. For instance, in the U.K., failing to cooperate with an immigration investigation by, say, not providing fingerprints, can put you in prison for a year, whereas here it would typically lead to more time in detention.)

Another student is writing about how liberal theory does and does not accommodate practices of immigration detention, a study that is path-breaking in that takes as a conceptual problem an important but heretofore marginal fact for political theorists. Placing the nitty-gritty details of immigration policy at the center stage of serious theoretical research is absolutely the right move for advancing scholarly and public discussion of our barbaric practices.

It was clear from those conversations as well as a meeting the previous week with Professor Engin Isin (editor of the journal Citizenship Studies) and conversations with Professor Matthew Gibney and his students on Wednesday at Oxford that citizenship studies, if not immigration studies, in England are producing a lot more interesting research and analysis than on this side of the pond. One thought among my colleagues was to blame this on U.S. political science, which kills any interesting subject before it can be examined in real life; that actually seems right to me.

Citizenship studies requires developing heuristics and thinking about history and narrative; political science departments in the U.S. are terrible at this. The best scholarship on this topic in the U.S. is from law professors or those in legal studies but that has different constraints.

Finally, one disappointment was that Engin had told me Agamben's influence had diminished in England but at least two presenters relied on his work quite heavily. Happily, others were eager to wrestle with Agamben's work.
===
Oh, my own contribution to the workshop was a Powerpoint presentation of my data on the detention and deportation of U.S. citizens. The information will appear in a forthcoming issue of the Virginia Journal of Social Policy and the Law. The article is pithily titled "U.S. Government Illegally Detaining and Deporting U.S. Citizens as Aliens."

I showed a photo of the ICE office in Cary, North Carolina that held Mark Lyttle, but forgot to mention that it was adjacent an Oxford University Press printing plant.

------------
correction, thursday: the original post misspelled Engin Isin's name. It's now corrected. Also, he has a really wonderful website, including a lovely "about" description, the updated version of W.E.B. Du Bois's version of Dusk of Dawn: An Autobiography of the Concept of Race. Engin's is an autobiography of the concept of the cosmopolitan.

POSTED BY JACQUELINE STEVENS AT 06:43   NO COMMENTS:
   LINKS TO THIS POST
   LABELS: ACADEMIA, CITIZENSHIP, IMMIGRATION

---

THURSDAY, FEBRUARY 18, 2010

## Joe Anderson's Attorney to ICE: Read the Rules, Stop Holding Someone With Evidence of U.S. Citizenship

law, the individual may be arrested and processed for removal. In all cases, any uncerta
whether the evidence is probative of U.S. citizenship should weigh against detention.

Last week I wrote about Joseph Anderson, someone the U.S. government is trying to deport despite evidence indicating he is a U.S. citizen.

ICE has issued the following statement:

   In the immigration proceedings concerning
   Joseph Anderson and issues related to his continued
   detention, ICE maintains, based upon documentation
   and court decisions, that Mr. Anderson is a citizen
   of the Philippines and a lawfully admitted permanent
   resident of the United States who has forfeited his
   residency status due to [criminal convictions for

nonviolent crimes].

Significantly, in October 1977, the U.S. Embassy in
Manila rejected Mr. Anderson's claim to U.S.
citizenship because he was not his U.S. citizen
stepfather Harold Anderson's blood child and
therefore did not have a valid claim at that time.

[Mr. Anderson is not a "blood child"?  What kind
of 21st century government uses the language of a
"blood child"?]

Mr. Anderson was admitted into the United States as
a lawful permanent resident in 1978 as the step-child
of a U.S. citizen.

In November 2003, Mr. Anderson was convicted of Arizona
state felony charges ... [P]ermanent residents guilty
of these crimes are subject to removal from the United
States.  As a result, he came into the custody of U.S.
Immigration and Customs Enforcement when he completed
his sentence in June 2007 in order to be placed in
removal proceedings.

Multiple court decisions by the Executive Office for
Immigration Review and the Board of Immigration
Appeals (BIA) have since found that Mr. Anderson is
not a citizen of the United States and that he should
be removed to the Philippines for his crimes.  Mr.
Anderson has not submitted any probative evidence
that he was legitimated by his step-father, Mr. Harold
Anderson, under federal or state laws following his
admission as a lawful permanent resident in 1978.
Nevertheless, he will continue to have an
opportunity to do so in upcoming appeal proceedings,
as he has a Petition for Review pending with the
Ninth Circuit Court of Appeals.

Mr. Anderson is a felon ..., thus ICE is statutorily
mandated by the Immigration and Nationality Act to
keep him in detention during his proceedings.
However, based on 9th Circuit precedent decisions, he
was entitled to and has received a bond redetermination
hearing, at which an immigration judge ordered his
release upon the payment of a $10,000 bond. He has
failed to post that bond, and thus remains in ICE
custody.

Here is the problem with this statement: Mr. Herbert Flores-Torres.
Last week I made a mistake and said that ICE held him, a U.S. citizen,
without authority for three years.

In fact, ICE locked up Mr. Flores without authority from June, 2005
until December, 2009, four and a half years. (There are many other
cases like this I've encountered in my research; space does not permit
their discussion here.)

Mr. Flores suffered through the same legal nightmare and ICE custody
as Mr. Anderson--including several negative decisions on his U.S.
citizenship claim by an immigration judge (hereafter, EOIR attorney)
and the Board of Immigration Appeals. But he eventually won.

To ward against this ICE has come up with a new policy: the
government may issue deportation orders and require hearings in an
immigration court, but ICE may not keep people in custody who
provide evidence of U.S. citizenship. The memorandum says, "In all
cases, any uncertainty about whether the evidence is probative of U.S.
citizenship should weigh against detention."

Regardless of the ultimate determination of Mr. Anderson's citizenship,
Kari Hong, Mr. Anderson's attorney, thinks it's time for ICE to start
following its own rules and release her client immediately: "The policy
allows the immigration proceedings to continue but with him to be out
of custody. This seems a reasonable regulation. It ensures you do not
have a U.S. citizen detained. ICE appears to be in violation of its own
regulation."

Although finding against Mr. Anderson on the merits of his claim, the
Board of Immigration Appeals found evidence on his side and wrote,
"We agree there is some support for his argument" claiming U.S.
citizenship.

That this position has been rejected means little as far the final
disposition of Mr. Anderson's citizenship claims. Mr. Flores is a U.S.
citizen and the BIA ruled against him as well. However, it's hard to
understand how the government can maintain it has certainty that Mr.
Anderson lacks any evidence of citizenship when the BIA says it found
"some support for his argument."

Moreover, the government is in no position to assert its certainty about Mr. Anderson's evidence when they were demonstrably wrong about similar claims they made in the case of Mr. Flores, and when the EOIR has had so many of its decisions reversed by the federal courts. One federal decision went so far as to publicly ridicule the EOIR:

> This tension between judicial and administrative adjudicators is not due to judicial hostility to the nation's immigration policies or to a misconception of the proper standard of judicial review of administrative decisions. It is due to the fact that the adjudication of these cases at the administrative level has fallen below the minimum standards of legal justice. Whether this is due to resource constraints or to other circumstances beyond the Board's and the Immigration Court's control, we do not know, though we note that the problem is not of recent origin. All that is clear is that it cannot be in the interest of the immigration authorities, the taxpayer, the federal judiciary, or citizens concerned with the effective enforcement of the nation's immigration laws for removal orders to be routinely nullified by the courts, and that the power of correction lies in the Department of Homeland Security, which prosecutes removal cases, and the Department of Justice, which adjudicates them in its Immigration Court and Board of Immigration Appeals. Benslimane v. Gonzales, 430 F.3d 829 (2005).

In Mr. Flores's case the district court judge's opinion on his case was a lengthy and nuanced evaluation of family law in California and El Salvador, a model of textual exegesis that bears no relation to the poorly reasoned opinions produced by the EOIR. For instance, Mr. Anderson is a citizen if Harold Anderson, Jr. is considered to have legitimated Joseph in his residence or domicile, as well as Joseph's place of birth. Under California law during this period, Harold Jr. appears to be Joseph's presumptive father, but the Board only considered paternity laws in the Philippines.

In his second Motion to Reconsider, Mr. Anderson's appeal conveyed frustration with the Board's failure to consider the law and legal analysis:

> In its decision, this Board stated, 'Insofar as the respondent was born in the Philippines, we must look to that jurisdiction's laws to determine whether he has been legitimated.' BIA dec. at 2. The decision offered no explanation as to why the place of birth controls for purposes of legitimation. [Note:] Several paragraphs before the discussion of legitimation, the decision states that the 'applicable law for transmitting citizenship' is the 'law in effect on the child's birth date.' BIA Dec.at 2. While this Board's decision may be implying that the relevant law is also the law in effect at the place and time of the child's birth, case law only supports the interpretation that the date of the child's birth is controlling for purposes of determining the law under which citizenship, not legitimacy, will be determined. Furthermore, the idea that the applicable law of legitimacy is the law in effect at the place and time of birth is at odds with the plain language of the statute...

No wonder the federal courts have to intervene.

This is not to say the federal courts always get it right. Two recent opinions in the Ninth Circuit misread U.S. citizenship law and misstate the history of kinship rules in world history, including the United States. Martinez-Madera v. Holder, 599 F.3d 947 (2009) and U.S. v. Marguet-Pillado, 560 F.3d 1078 (2009) assume that families are based on "blood," not law.

Here's what the opinion states in Marguet-Pillado:

> It is a commonplace that the traditional ways of transmitting and acquiring citizenship at birth are jus soli and jus sanguinis. In this country, the former is provided for by the Constitution, and the latter is provided for by the enactments of Congress. It would be a bit surprising to discover that over the decades Congress had selected a method that relied on neither concept, but, rather, was content to have United States citizenship acquired at birth by a person born out of wedlock, who was not born on United States soil and who, at the time, did not have a natural parent who was a United States citizen. As it is, there is no cause for surprise

The problem with this passage is that citizenship law from 1953-1986 provides for exactly this possibility, by making family ties retroactive to the time of birth. A step-father who marries one's mother becomes one's father under this law.

8 USC §1409(a) defines "child" for purposes of acquired citizenship as an

> unmarried person under twenty-one years of age who is—(A) a child born in wedlock; (B) **a stepchild, whether or not born out of wedlock, provided the child had not reached the age of eighteen years at the time the marriage creating the status of step child occurred;** (C) a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of he legitimating parent or parents at the time of such legitimation; (D) a child born out of wedlock, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother or to its natural father if the father has or had a bona fide parent-child relationship with the person.

(B) applies not only to the situation the appellate court ridicules, but to Harold Andersons Jr.'s relation to his son, Joseph. Only Officer Anderson was named on Joseph's birth certificate as his father, had married Joseph's mother, and had held him out as his son as long as Joseph knew.

Moreover, the truly absurd statement is that kinship ties have been based on knowledge about paternal genetics. That information was not even available until the late 20th century. This language, and laws about the authority of State Department findings, also explains why the U.S. embassy's ruling against Mr. Anderson's citizenship claim when he was two do not controvert his claim now.

Many other U.S. citizens had been given improper documents at some point indicating they were legal permanent residents. This is evidence of government error, not grounds for deportation.

Complicated legal questions cannot be evaluated by a blog. But if the government says that ICE may not incarcerate anyone who has even the possibility of probative evidence of U.S. citizenship, and Mr. Anderson has grounds for his arguments, then while this is being settled, ICE should not risk punishing Mr. Anderson for its mistakes, as it demonstrably did in the case of Mr. Flores.

Mr. Anderson's family cannot afford the $10,000 bond. The procedures for releasing people with evidence of U.S. citizenship apply to everyone, regardless of any criminal history. Mr. Anderson served his time for a nonviolent crime far less severe than the one his government is perpetrating against him: false imprisonment. It's time for his government to follow the rule of law and release him.

-----------------
Thanks to the ACLU, the Nation, the Nation Institute, and Yale Law School's Media Freedom and Information Access Practicum I did go on the tour of the Varick Detention Center on Tuesday. I will be writing about this shortly for The Nation and at more length here as well.

Also, on Sunday, Henry Raines had me on his am radio show in Tampa to talk about States Without Nations, the book. If you want to hear a caller denounce me as a pot smoker (his claim, not mine), listen in...

POSTED BY JACQUELINE STEVENS AT 11:31   NO COMMENTS:
LINKS TO THIS POST   ✉
LABELS: CITIZENSHIP, ICE DEPORTING US CITIZENS, JOSEPH ANDERSON

-------------------------------------------------------------------

MONDAY, FEBRUARY 8, 2010

## ICE Agents Lose Track of US Citizens in their Custody, And the Rules for Releasing Them



On April 9, 2008, when I met Joe Anderson, then 30, through a televideo contraption, he was still in shock.

It had been over three months since ICE locked him up at the Pinal County Jail in southern Arizona while they were disputing his U.S. citizenship and Joe still couldn't believe it. His family lacked funds for an attorney and he was doing his best to represent himself, and also relying on the advice of overstretched attorneys at the Florence Immigrant and Refugee Rights Project, which runs the EOIR's Legal Orientation Program in the area.

In late March, 2009 Joe was still there. Confusion and outrage were replaced by grief and frustration over the senseless deprivation of his liberty and the threat that he would be sent to a country he hadn't seen since infancy and where they spoke a language he couldn't understand.

Joe said he was keeping his eye out for shows on the Travel Channel, in case they had something on restaurants in the Philippines, the country to which his former state governor, Janet Napolitano, is trying to ship him. He was thinking it might be good to know about fancy tourist restaurants that might need a native English-speaker.

(I asked him about the access to cable television and he said ruefully, "Oh, yeah, they keep us well-entertained in here.")

Because he was born on a foreign military base, as was his Senator, John McCain (R-AZ), Joe's evidence of U.S. citizenship is more complicated than a simple birth certificate.

Under ICE procedures, ICE is prohibited from keeping him locked up while the government sorts this out.

A memorandum from John Morton, ICE Assistant Secretary dated November 19, 2009, which I obtained recently through a FOIA request, states:

> If an individual already in custody claims to be a USC, an officer must immediately examine the merits of the claim and notify and consult with his or her local OCC [Office of Chief Counsel] ... If the individual's claim is credible on its face, or if the investigation results in **probative evidence that the detained individual is a USC** [US Citizen], **the individual should be released from detention**.

"Probative," according to the Oxford English Dictionary, means "Having the quality or function of proving or demonstrating; affording proof or evidence; demonstrative, evidential."

Joe's birth certificate with his father's name on it, and the copious documentation of his father's marriage to Joe's mother as well as the rules for legitimacy and paternity in the places of his residence (California and Arizona) easily meet this criterion. Probative does not mean conclusive "proof," only that the evidence is relevant and could contribute to legal decision.

This morning I called the Pinal County Jail and spoke with Commander Montanyo. I told him that the jail he was running for ICE was holding someone over whom ICE had no legal authority. He gave me the number of the ICE deportation and removal office at the nearby Florence Service Processing Center (Orwell talk for ICE Jail).

I called the ICE jail where the ICE agents work in Florence and the operator said I needed to speak to "upper management." She connected me to the voice mail for Nicole Moore and I left a message indicating that her office was unlawfully ordering the confinement of someone with probative evidence of U.S. citizenship.

Because the procedures indicate that ICE prosecutors are supposed to review these cases, I called the DHS Phoenix office and spoke with the

ICE desk attorney, Jim Harmony. I provided him with Joe's full name and "alien number" but Mr. Harmony said that he could not locate Joe in his database and questioned whether he was still being detained.

I gave Mr. Harmony the phone number of the Pinal County Jail as well as the phone numbers of two attorneys now assisting Joe with his appeals. He assured me he would investigate and provide me information he was authorized to make available to me.

A few hours later I called the Florence ICE jail and someone answered the phone.

Officer S. pulled up Joe's file and correctly pointed out that an "immigration judge" (hereafter EOIR attorney--these folks are NOT actual judges) and the Board of Immigration Appeals had found that Joe was not a U.S. citizen.

I pointed out that this was not a legally final determination of Joe's citizenship. BIA decisions on acquired and derived U.S. citizenship claim have been overturned by the Ninth Circuit Appellate Court and, recently, even by a district court judge- I will discuss Herbert Flores-Torres' case in a later post because it's so fabulous and also so complicated.

The rule I had quoted was not requiring ICE to release only people who had proven conclusively to be U.S. citizens--alas, ICE also needs education on this as well--but was indicating ICE agents lacked the legal authority to hold people who had "probative evidence" of U.S. citizenship.

Joe is not his father's biological son, but under the laws of Arizona and California, Joe is his father's legitimate son and this--along with the legal documents verifying this--is sufficient to trigger acquired U.S. citizenship. However, the BIA simply substituted their own understanding of paternity for the one in the law. In a related case in the Ninth Circuit, Herbert Flores-Torres recently prevailed in a derived citizenship claim that had been ruled invalid by an EOIR attorney and the BIA, but only after he had been held in ICE detention for two years.

The memorandum from Morton states:

> While some cases may be easily resolved, because of the complexity of citizenship and nationality law, many require additional investigation and substantial legal analysis. As a matter of law, ICE cannot assert its civil immigration authority to arrest and/or detain a USC.

In the case of Mr. Flores-Torres, and thousands of other US citizens who have been confined by ICE, ICE has been demonstrably breaking this law.

Presumably that's why these procedures were developed. The only way that ICE can guarantee it is not confining U.S. citizens is if it releases people who are attempting to prove they are U.S. citizens.

DUH, right?

Except that Officer S. at the Florence ICE jail wasn't buying it. After telling me that the ICE records did not indicate Joe had even claimed US citizenship, which explains why his file had not been reviewed for release as the new procedures required, Officer S. kept repeating that the immigration judge and BIA had found against Joe and ICE was holding him for the appeal.

I repeated the points above and Officer S. said he would call me back.

True to his word, he called, "Can you send me a copy of what you were reading so I can send it to litigation?" I asked if he had misplaced his own copy or if he just had no idea what I was talking about. He said, "They come out with these new things every day."

Basically ICE was keeping its rules secret and then after I obtained them via a FOIA request, requiring me to send them their own rules in order for them to be enforced. (Sometimes I feel like ICE is detaining all the immigration attorneys, civil rights lawyers, and even me with this nonsense.)

"I was supposed to get out on my grandmother's birthday," December 23, 2007, Joe told me the first time we met. "She said that was the best present she could have." More than two Christmases later, in clear violation of ICE procedures, the law, and common sense, Joe remains locked up in the Pinal County Jail.

Jennie Pasquarella, staff attorney with the Southern California ACLU, after I explained the case, was struck by how long Joe's been detained: "Regardless of this memo, there's no good policy reason why someone with a credible claim to U.S. citizenship should be detained for years while they're fighting their case."

I'll be checking back in with the folks at ICE tomorrow and see if they have decided to read and follow their own rules.

POSTED BY JACQUELINE STEVENS AT 10:21    NO COMMENTS:

LINKS TO THIS POST    ✉

LABELS: CITIZENSHIP, EOIR, ICE, JOSEPH ANDERSON, MARK LYTTLE, NATIONARTICLEFACTS

---

TUESDAY, DECEMBER 22, 2009

## "Home Sweet Home!" says US Citizen American Government Rendered Stateless



Ten years after being illegally banished from his country, U.S. citizen Johann Francis was reunited with his mother and two sisters in an Atlanta airport early Sunday morning. (For background, please go here.)

On Monday he spent the day figuring out new gadgets, including the shower, and catching up with his family and life in America: "I've been away so long. Readjusting is really something. It's like if you haven't eaten salt in ten years and someone gives you a chimichanga."

When Mark Lyttle returned to the Atlanta airport last spring after he was illegally deported he was held for two days and the government prepared to deport him again, despite a freshly minted US passport. Johann's response to hearing about Mark's experience of being told his passport was fraudulently obtained was, "How stupid do they look? You can just lie and get a passport? Do you know how many people are trying to get into the United States and they're saying you can get one if you just lie?"

In the event, Johann entered the US at the Fort Lauderdale airport Saturday evening with no significant delay. Barbara Gonzalez, an ICE public affairs officer, had transmitted information about his return in advance to the Customs and Border Protection office that had presumably updated his records. Johann also had a sealed letter from the US Consulate in Jamaica and produced this after the agent at the checkpoint was "staring with a confused look at the computer, like he didn't know what to do."

The agent brought Johann to an adjacent room and he sat there with his luggage, not sure what was happening or would happen next, "I got scared, that I'm-in-trouble-feeling, worried it's all going to happen all over again. I was just trying to be calm." 40 minutes later an officer came in and asked Johann two questions, if his mother was single (yes)

and how old he was when he had his citizenship (14). But they kept the copy of the letter from the US consulate. Johann said, "I really want that letter. I'm scared."

In Jamaica, Johann had expressed his discomfort with the unfairness of feeling this way, "I feel like I'm doing something wrong, or like they're doing me a favor [by issuing the passport]. I feel like I have to ask a favor of them."

(I have written a note to Barbara Gonzalez asking for procedures US citizens should follow if they want to make sure that earlier wrongful deportations do not haunt them forever--right now the FBI database will indicate that he is illegally in the country and he may be arrested for illegal reentry--and will post the reply when it arrives.)

That feeling of not quite fitting in or being accepted by one's own country emerged repeatedly in our conversations as a burden and also a source of strength. The first time we spoke, Johann told me about speaking with his mother from Jamaica after he'd lost touch with her for almost two years, "Wow, we've been looking for you," she said, "I could hear a sigh of relief that I wasn't dead or hurt somewhere. That was hard, hearing my mother's voice again. It was almost painful. I didn't cry because I was used to being alone. We were in Washington State. I am from Jamaica. There are no Jamaicans in Washington State."

And there weren't many deported US citizens in Jamaica. One of the most difficult challenges Johann endured was hiding his deportation, "I couldn't say, 'Hi my name is Johann Francis and I've been deported from the United States because those people are looked down on. They're outcasts. It's like, you had your chance and you blew it. Why should I help you now?" But Johann could not locate any Jamaican documents to verify his birth there--which he would need for either Jamaican or US citizenship. Although he was by law a US citizen, he was de facto stateless and invented various tax numbers and so forth for later employment.

Hiding his identity was not easy. First, there was the accent. Johann spoke American. He made up a story of going to the US for education and returning to Jamaica by choice. But it also was hard when people believed him. Speaking from Jamaica a few days before returning, Johann said:

> "I'm still going with that story up to this day. That was a mental drain, being unable to speak Jamaican without an accent, and I had to go through the whole fabrication. I've been constantly somebody else. I think three people knew my true story. I don't know if you know the psychology, but when you hear a foreign person who speaks another language, when they get upset, they start speaking that language. It's an expression of themselves and who they are and they relate better speaking the language they know and feel frustrated speaking a language they don't know. That's me for ten years. In the seventh or eighth year I started associating myself with other deportees for the sake of wanting to be home in America. That was so wierd. I could relate to them whether I was a citizen or not. I told one or two of them the truth becuase you want to talk to somebody. You want to tell your story."

One interesting piece of Johann's story is a legal misunderstanding on the part of his mother, one that persisted until his seventh or eighth year in Jamaica. His mother knew that Johann had derived US citizenship, the equivalent of citizenship at birth, when he was 14 through her naturalization. She simply assumed that the US would not deport a US citizen and inferred from his deportation that the government had revoked his citizenship. Once they realized that this is not what had transpired, and that Johann had his US citizenship rights stolen by a US government that had flagrantly violated his due process rights, Johann began his quest to return.

Until the government clears up the legal mess it created, Johann is still at risk of arrest, but he is very happy to be back and begin to tell his story.

POSTED BY JACQUELINE STEVENS AT 11:14   2 COMMENTS:

    LINKS TO THIS POST   ✉

LABELS: CITIZENSHIP, ICE DEPORTING US CITIZENS, JOHANN FRANCIS, MARK LYTTLE

FRIDAY, DECEMBER 18, 2009

<span style="color:#E8751A">**US Citizen Unlawfully Deported Ten Years Ago
Returns Tomorrow**</span>



U.S. citizen Johann Francis, 30, unlawfully deported from the United
States, returns tomorrow from Jamaica to celebrate Christmas with his
family in Atlanta for the first time in ten years.

**Why Was Johann Deported?** The quick answer is that the U.S., like
other countries, continues to use medieval rules to regulate the
movement of people across state boundaries. These regulations were
thrown out a few hundred years ago when they were used to restrict
movement among villages and they are equally absurd for regulating
movement among countries.

    Of course even under current laws, US citizens may not be
deported. Yet Johann and thousands of other U.S. citizens will tell you
that this has happened to them. Johann's story, alas, is a familiar one: a
youthful run-in with the law, a couch-surfing mother on the other side
of the country, no attorney, and voila, a one-way ticket to Jamaica, the
judge telling him, "You're deported forever."

    <u>The Facts</u>

    **Johann a US Citizen.** Johann moved to the US with his
mother when he was 7, at which time received a green card indicating
he was a lawful permanent resident. His mother was not married to his
father; his father is not listed on Johann's birth certificate, and his
mother always had sole custody of him. Thus, when Johann was 14 and
his mother naturalized, he automatically derived US citizenship.

    **Johann and Mother Cannot Find Each Other.** Johann
described a childhood of moving around among various military bases
as his mother accompanied his stepfather to new posts. After a
separation his mother, broke, decided to leave Washington because her
employment prospects were better in Atlanta. The timing could not
have been worse, "It was January of my senior year. I was very
distraught because I wanted to graduate with my friends. I was 18 and
working at the Safeway and told my mother, 'Hey, I want to finish, and
stay, and graduate.' She said that was fine." However, his mother's
economic situation did not improve and she was moving from relative
to relative and then motel to motel. Meanwhile, Johann also was
having a tough time, also moved, and his mother could not locate him,
either.

    **Johann Goes to Prison.** Shortly before Johann was supposed
to graduate, he and some friends had a Westside Story encounter in
Seaside, Oregon, the result of which was that Johann pled guilty to
felonious assault and served one year in the Oregon Shutter Creek

prison boot camp, "Boot camp was really important to me because out of the 96 inmates who started, only 26 finished. I was one of the model prisoners there, the guy who carries the flag. I did very well and I was proud that I graduated."

**Johann Sent to Detention Center.** "On graduation day I was told I couldn't leave because I have an INS hold." Johann said that as far as he knew he was never interviewed by anyone from the INS. Johann said he told the guards in Oregon that he thought he was a US citizen, but when they asked him the year his mother became a U.S. citizen and he couldn't answer, they "shipped me to Arizona, to Eloy."

At this point the line was quiet and I thought maybe we lost the connection. Johann was sobbing and trying to regain composure, explaining that he thought he was a U.S. citizen but had no means of contacting his mother in order to obtain the documents for proving this. "I'm talking to inmates who are in there for two or three years. Are you kidding me? Some are trying to get asylum and my story just sounds impossible. Okay, you're a citizen, too. I don't have any money. I can't afford a lawyer. Nobody knows where I'm at. By the time my mother catches up and finds out that I'm not in Washington or a hospital and that I may be in Oregon, I'm not even there. I'm in Arizona." Johann was in tears, "I didn't know or understand the whole law. I knew they weren't supposed to... But they did. I signed the papers. I signed it. It's my fault and the judge said never to return. I have nightmares. I'm thinking to myself, even if I had a right I could have signed it away." (By the time he was in Eloy, Johann was entirely confused about whether he really was a US citizen. He spent three months there and wanted to leave confinement.)

## "It's so amazing what you can do with a coconut, but it 's not a well-balanced diet." Johann's life in

Jamaica for the last ten years has been one of despair and resourcefulness, about which I will write more on Monday. One major difficulty was that until 2007 it was impossible to locate one's birth certificate without a number. However, in 2007 a new digital system was put in place, and that's what eventually allowed Johann to track down his certificate and bring it to the US consulate which, along with the legal documents from his mother, proved his US citizenship. On October 30, 2009, Johann received a US passport: "When I got it I told myself, this is the prettiest piece of paper I've ever seen."

Johann endured various diseases associated with malnutrition but eventually found his bearings and, drawing on his high school broadcasting experience, began to independently produce a television show on the local tourist industry for which the businesses paid Johann and Johann paid the television station for air time. Before sending me his photograph Johann explained that they do not do justice to his hardships, "Most of the pictures I have taken are when things are good. People are going to see these and say, 'Wow, this guy looks great. Send me to Jamaica.' How I am now, coming home, is not the meager, malnourished person I was four or five years ago. I didn't want to be the poor puppy that just came home. That's good PR, but that's not me."

**In time for Christmas.** Johann is scheduled to arrive tomorrow, Saturday, December 19 in Atlanta via Fort Lauderdale. He has a sealed envelope with a letter from the US consulate verifying the authenticity of his US passport. The consular officer realized that Johann might have the sort of experience Mark Lyttle endured on returning with a valid US passport from his unlawful deportation in April, when the government tried to execute and "expedited removal order" and failed to return phone calls from Marks' attorney.

**After the Holidays.** Even if Johann is successful in returning, the decade old unlawful deportation order remaining in his federal record could easily trigger a new criminal arrest for Illegal Reentry. And, if Johann is pulled over for a speeding ticket, especially in the

Atlanta area, it seems likely that he would be once more in the net of ICE. After I called ICE public affairs officer Barbara Gonzalez last spring, ICE agents and attorneys retracted the ICE deportation documents and requested that William Cassidy terminate and vacate his illegal deportation order. Cassidy did so.

I am sending this information to Immigration and Customs Enforcement and the Customs and Border Protection and hope that they are able to begin to offer this minimal and late protection against further unlawful confinement and other forms of government harassment stemming from Johann Francis's unlawful deportation.

----------

**How I learned about Johann's travails.** On the basis of reading this blog, Johann sent me an email last week. Since then we've spoken on the telephone. The information above is based on those conversations. He contacted me because he wanted to publicize his experience, "People shouldn't have to go through this. Ultimately, if we need a better system in place where we can avoid illegal deportations If I can have a hand in that, that would be good."

POSTED BY JACQUELINE STEVENS AT 10:15  5 COMMENTS:
LINKS TO THIS POST

LABELS: CITIZENSHIP, ICE, ICE DEPORTING US CITIZENS, JOHANN FRANCIS,
MARK LYTTLE

---

TUESDAY, NOVEMBER 10, 2009

## A Word From Our Sponsor...



Okay, I guess that's me.

States Without Nations: Citizenship for Mortals may not exist, but the book is now a reality. It was published this week by Columbia University Press as part of its series New Directions in Critical Theory, edited by Amy Allen.

I hope you judge it by the cover. (Thank you, Columbia designers!)

Here's the catalogue copy:

As citizens, we hold certain truths to be self-evident: that the rights to own land, marry, inherit property, and especially to assume birthright citizenship should be guaranteed by the state. The laws promoting these rights appear not only to preserve our liberty but to guarantee society remains just. Yet considering how much violence and inequality results from these legal mandates, Jacqueline Stevens asks whether we might be making

the wrong assumptions. Would a world without such laws be more just?

Arguing that the core laws of the nation-state are more about a fear of death than a desire for freedom, Stevens imagines a world in which birthright citizenship, family inheritance, state-sanctioned marriage, and private land ownership are eliminated. Would chaos be the result? Drawing on political theory and history and incorporating contemporary social and economic data, she brilliantly critiques our sentimental attachments to birthright citizenship, inheritance, and marriage and highlights their harmful outcomes, including war, global apartheid, destitution, family misery, and environmental damage. It might be hard to imagine countries without the rules of membership and ownership that have come to define them, but conjuring new ways of reconciling our laws with the condition of mortality reveals the flaws of our present institutions and inspires hope for moving beyond them.

And, yes, there are blurbs:

"Imagining governments and citizenship unbeholden to rules of birth-that is, cleaving the state from the family (i.e. the nation)-is the single most important thought experiment in political theory since John Rawls asked us to consider justice from a position of veiled ignorance. Jacqueline Stevens is not just a punchy provacateur, she is a careful scholar and an engaging writer. States without Nations is a must read for any scholar of the politics, sociology or legal studies of the state-and anyone concerned with distributive justice." — Dalton Conley, Dean for the Social Sciences, New York University

"States without Nations is a scathing indictment of kinship-based membership. In an argument as unrelenting as it is brilliant, Jacqueline Stevens challenges feminists, liberals, and, indeed, anyone who values peace and security, to join her in recognizing and rejecting kinship as the ultimate source of violence. This original and much-needed intervention will reshape debates in international relations, political science, and women's studies." — Jodi Dean, author of Democracy and Other Neoliberal Fantasies

"States Without Nations is a brutal exposé of the violent and mutually implicating underpinnings of liberal theory and national identity, and it constitutes nothing less than an early attempt to reconceptualize and reorganize world citizenship anew. I find it brilliant, bold, breathtaking, pioneering, far-reaching, and visionary. There's nothing else quite like it." — John Evan Seery, professor of politics, Pomona College

"No myth needs exploding more urgently than that of the tight association of state with nation, of the exigencies of governance with the idea of people defined by culture and common descent. No misconception has done more damage in modern political theory. And no theorist is better positioned to explode this myth-in its birthright, where it lives, in its premises of blood and land and birth-than Jacqueline Stevens." — Jeremy Waldron, University Professor, New York University School of Law

Order Book

POSTED BY JACQUELINE STEVENS AT 05:32　NO COMMENTS:

LINKS TO THIS POST　✉

LABELS: ACADEMIA, CITIZENSHIP, INHERITANCE, MARRIAGE, NATIONALITY

---

MONDAY, OCTOBER 26, 2009

## Newly Released ICE Memorandum Admits US Citizens in ICE Custody



On November 6, 2008 James Hayes, Jr., Director of Detention and Removal Operations (DRO) for Immigration and Customs Enforcement (ICE), signed a memorandum "Superseding Guidance on Reporting and Investigating Claims to United States Citizenship.http://www.governmentillegals.org/HayesUSCMemo110608.PDF" (Among the many Obama holdovers of policy and personnel from the Bush administration are the folks running ICE, including Hayes, presently "Acting" in this same position.)

> **Superseding Guidance on Reporting and Investigating Claims to United States Citizenship**

The memorandum spells out the procedures DRO agents are supposed to follow when they are holding U.S. citizens, a situation the memorandum acknowledges is especially likely to occur when DRO officers are "exercising authority under section 287 of the Immigration and Nationality Act, 8 U.S.C.S. §1357," a provision authorizing local law enforcement agencies to detain aliens, not U.S. citizens. Section 287 has been associated with numerous egregious law-breaking acts by local police officers and sheriff's officers, as well as by ICE agents, including the deportation of US citizens through classifications initiated in state prisons and county jails.

I recently received the document in partial response to a FOIA request for ICE documents pertaining to Mark Lyttle, a U.S. citizen who was born in North Carolina. Last fall ICE agents invented a name for him and signed documents indicating he was born in Mexico, even though their own reports from various databases clearly stated that Mark was a U.S. citizen and born in the United States. (For more on Mark's case, read here.)

The two-page memorandum reveals the following:

+ While ICE public affairs officers were telling reporters ICE was "never" detaining U.S. citizens, ICE Operations officials were telling its detention and removal officers, here's what you should do to stop detaining U.S. citizens.

+ ICE officers are supposed to be investigating whether people who may not know they are U.S. citizens are indeed U.S. citizens. In the cases I have studied, agents do not do this, and they ignore hard evidence of US citizenship that arises in this research. (The file ICE had for Mark included printouts from federal and state law enforcement databases indicating in numerous places that he was a US citizen and that he was born in the United States.)

+ ICE is violating its policies on classifying documents. This "law enforcement sensitive" classification may be used only when the release of the document "could cause harm to a person's privacy or welfare, adversely impact economic or industrial institutions, or compromise programs or operations essential to the safeguarding of our national interests." (See Department of Homeland Security Management Directive System's classification "For Official Use Only.".)

None of the above apply to a memorandum protecting the civil rights of U.S. citizens.

This rule states further: "Information shall not be designated FOUO [this includes "law enforcement sensitive"] in order to conceal government negligence, ineptitude, illegalities, or other disreputable circumstances embarrassing to a government agency."

Prohibiting public disclosure of rules that protect the rights of U.S. citizens has no legitimate law enforcement purpose. Its only function is to allow ICE to deny it is deporting US citizens and to deny those in ICE custody knowledge of their due process rights.

Should ICE be commended for issuing a memorandum in which it is attempting to encourage more care on the part of its agents? This is tempting, if one lives in the land of Sheriff Joe Arpaio. For those of us who still remember the U.S. Constitution, this document should be a call to action.

The only honorable and legally valid memorandum from an agency aware that when it tries to implement a law designed to deport criminal aliens it demonstrably risks deporting U.S. citizens, i.e., kidnapping, is one to Congress urging the repeal of 287: "We cannot enforce this law without violating the due process rights of U.S. citizens. Therefore, we are requesting that Congress repeal 287 g and provide full due process protections to everyone in removal proceedings."

Of course Congress can also do this itself, or it can wait and allow US citizens to be rendered stateless while wasting taxpayer money on the lawsuits across the country as these situations are remedied.

(For more on the illicit actions from 287g operations, see "The Policies and Politics of Local Immigration Enforcement Laws," issued by University of North Carolina and the North Carolina ACLU in February 2009 and "Forcing Our Blues Into Gray Areas: Local Police and Federal Immigration Enforcement," a report by Appleseed, revised January, 2008.)

POSTED BY JACQUELINE STEVENS AT 08:14  3 COMMENTS:
LINKS TO THIS POST  ✉
LABELS: CITIZENSHIP, ICE, ICE DEPORTING US CITIZENS, MARK LYTTLE

---

SUNDAY, AUGUST 30, 2009

### Raleigh News and Observer Story on Mark Lyttle and the ICEcapades



Kristin Collins' article U.S. ignored evidence when it deported U.S. citizen to Mexico appeared in today's Raleigh News and Observer. It provides a succinct and revealing account of ICE mishaps leading to Mark Lyttle's deportation.

(Credit for today's post's headline goes to my friend Jamie; credit for the image goes
to Serendipity.)

update 8/31/09: the original post was linked to the Charlotte Observer, but the
story appeared first in Kristin Collins' own Raleigh News and Observer, as now
linked above.

POSTED BY JACQUELINE STEVENS AT 12:53   1 COMMENT:
   LINKS TO THIS POST   ✉
LABELS: CITIZENSHIP, DEPORTATION, ICE, ICE DEPORTING US CITIZENS,
MARK LYTTLE

---

THURSDAY, AUGUST 20, 2009

## The Mexican-izing of Mark Lyttle: The First Steps in Deporting a US Citizen



8/21/09--click here for a slightly different version published today on
Huffingtonpost.

---

Immigration and Customs Enforcement (ICE) has been deporting over
a million people each year. Most are Mexican citizens residing here
without legal status. But thousands of those being detained and even
deported are US citizens.

This sounds unbelievable, and it should. ICE has no authority over US
citizens. Nonetheless, a systematic examination of thousands of
individual case files for detainees in southern Arizona between 2006
and 2008 revealed that just over one percent were deemed US citizens
by an immigration judge.

Estimates are that an additional one percent of detainees are US
citizens but either do not know this, or choose not to remain locked up
for an indeterminate time with few due process rights and hence falsely
confess to alienage and agree to be deported.

(This estimate is based on reports from criminal attorneys contacted to
file habeas briefs, as well as pro bono immigration attorneys and
attorneys who work on federal contracts for Legal Orientation
Programs servicing detention centers.)

Mark Lyttle, 32, a US citizen born in Salisbury, North Carolina can
attest to all of this. He knows what it's like to be kicked out of his own
country and, among other things, have to pretend to be Cuban in
Honduras to avoid being put in a US prison for false impersonation of a
US citizen, a charge lodged against Mark by Customs and Border Patrol
at the Hidalgo border just after Christmas when he tried to return
home.

Right, this makes no sense, and it is unbelievable.

LEGAL INSANITY

Last week I received Mark's "alien file" maintained by the Department of Homeland Security. It includes a significant paper trail, or rather, copies of the legal paper chain that pulled Mark into statelessness.

Today I want to focus on the first tiny, ridiculously important event that led to Mark's four month journey through five countries in Latin America. In upcoming posts I'll review additional documents.

SCAAP at Neuse Correctional Institution

North Carolina is one of the numerous states participating in the State Criminal Alien Apprehension Program. (For more posts on this, start here.) This means prisons screen for aliens or possible aliens and report them to ICE. The ICE agent then comes to the prison, in this case the Neuse Correctional Institution in Goldsboro, North Carolina, and interviews the inmate to determine if that person's legal status as well as criminal record warrant deportation.

On August 27, 2008, according to a Neuse employee, "five or six ladies who do the admin intakes" would have been typing into the North Carolina Offender database vital statistics for the approximately 60 inmates they were screening that day.

For Mark this meant a record stating:

Race: OTHER
Complexion: MEDIUM
Ethnicity: ORIENTAL
Place of Birth: MEXICO

Mark says he remembers the interview. The woman told him he had brown skin, so maybe he was from Mexico. Or maybe he was "Oriental," whatever that means. She was going to alert ICE to follow up. (Perhaps she did this by typing "Mexico" as Mark's place of birth? I guess Mark was lucky: she could have typed "China" -- of course Mark has no relatives from Asia, either.)

The Neuse officer describing these procedures said the prison's job is alerting ICE to possible alienage but not making a final determination. After all, immigration status is the province of federal immigration agencies, not state prison employees. Upon learning that ICE issued an administrative removal order for someone Neuse had incorrectly characterized as born in Mexico, the officer said, "I don't understand how ICE did this. They're the ones who are supposed to check this."

On September 2, 2008, Mark signed an affadavit stating that his name was Jose Thomas and he was born in Mexico. The document's information is handwritten by ICE agent D. Faucette.

"Jose Thomas"-s mother is named as Jennie Lyttle (his mother's name is Jeanne) and his father is named as Thomas Lyttle – deceased.

The man who was swearing that his name was Jose Thomas and he was born in Mexico signed the statement: "Mark Lyttle." Mark does not speak a word of Spanish.

This was the solitary legal document attesting to Mark's alienage on which ICE relied when on September 5 a deportation officer issued Mark's "Final Administrative Removal Order." This document is authorized by 238b of the Immigrant and Nationality Act and deprives aliens and US citizens alike of the right to a hearing before an immigration judge.

At the time this order was issued, ICE also had Mark's FBI record designating his citizenship as "UNTD STATES AMERICA." And ICE had Mark's social security number. The false information that might justify removal was construed as factual and the accurate information indicating US citizenship was ignored. So was the information about Mark's long history of mental illness.

WHAT HAPPENED DURING THE INTERVIEW WITH AGENT D. FAUCETTE

When Mark returned to the United States he was detained by ICE in the Atlanta airport and interviewed on April 22. This is from an ICE transcript of that interview:

> Q. Do you remember why you were ordered removed in December 2008?
> A. I talked to an ICE officer and I asked her how Mexico was and to put me over there just to see how it was. She made up some kind of paperwork to make it look like I was from there.

Q. Did you ever tell the ICE officer you were from Mexico?
A. I never told her that.

Mark has a history of mental illness, which also was indicated in the criminal records ICE possessed. Indeed on December 17, 2008, an ICE health inspector evaluating Mark just before he was put on a plane to Mexico wrote:

> 1. Diagnosis - BIPLR I MOST RECENT EPIS MANIC MOD
> 2. Allergy - Medication - Medication
> 3. Med/Psych Alert

According to WebMD, Bipolar I disorder is a "form of mental illness. A person affected by bipolar 1 disorder has had at least one manic episode in his or her life. A manic episode is a period of abnormally elevated mood, accompanied by abnormal behavior that disrupts life."

Mark may have had a manic episode of wanderlust – one from which he tried to recover by signing a sworn statement on November 3, 2008 stating he was born in the United States and a US citizen.

ICE, however, maintained the delusion that the inconsistent and, frankly, goofy statement of Mark's alienage was authentic and claimed that the more credible and easily verifiable evidence of his US citizenship was false.

When I told Mark's attorney, Neil Rambana, that ICE had Mark's FBI record indicating he was a US citizen, Rambana was furious, "That is the most dangerous precedent I have ever heard. Someone swept a whole heap of dust under a carpet because they didn't want to do their job. These things are easily identifiable by those who have superior resources, but they failed to exercise an iota of effort."

Commenting on the ICE documents I was reading verbatim from the FOIA-d files, Rambana said, "Everything you are reading is disgusting to me. You just read three different things that all came full circle and all tried to cover themselves by saying he acquiesced. So what if he acquiesced? They should have ascertained the truth; they needed to dot their I-s and cross their T-s. They had someone who looks the part, so they seem to have thought, 'I'm just going to shuffle him through.'"

Mark is adopted, as are millions of other US citizens. Mark's biological father's name is as Mexican-sounding as Mark Lyttle; and of course someone in the US Embassy in Guatemala City contacted Jeanne Lyttle and was able to issue Mark a US passport based on the documents Jeanne faxed in less than 24 hours.

Rambana does not believe Mark's adoption ameliorates ICE's culpability: "This is the 21st century. People have all sorts of families. If we're not paying attention to the fact that this is a different age, when the nuclear family is not essential to someone's existence, then we are failing as a society."

ICE RESPONSE
According to ICE Public Affairs Officer Barbara Gonzalez, the agency believes that the decision by William Cassidy in Atlanta to deport Mark validated ICE's findings. Cassidy, like many so-called immigration judges, runs a kangaroo court. His actions on other occasions have provoked formal and informal complaints. And he has consistently ignored the instructions in the Immigration Judge Benchbook pertaining to the treatment of respondents who lack attorneys.

ICE has not indicated any concern about its agents deporting Mark. Gonzalez stated, "The review of the case shows that the officers executed a removal order issued by an immigration judge, so to my knowledge, there is no investigation into the matter."

When ICE presents sworn statements by their agents affirming the factually inaccurate narrative of a mental patient, and ICE ignores government records and sworn statements from the same individual that are factually accurate, and thus compiles a record prompting a judge to deport a US citizen, ICE thinks it has done its job.

On July 6, 2009 I asked Gonzalez: "Is it ICE policy that a sworn

statement to alienage be considered evidence of alienage and a sworn
statement of US citizenship be disregarded? This is a fact pattern in
many cases of US citizens being deported and I consider it a very
important policy question."

As of yesterday she was still working on a response. I will report this
and other statements from ICE as I review the additional documents in
Mark's file. (If you want to be notified of new posts, just click on the
RSS box on the far right side of the URL panel above.)

MARK'S RESPONSE
Mark is living in a group home in Virginia. We speak regularly. Mark's
comments a couple of months ago seem especially apt: "They're
supposed to be professional but they screwed up. The judge is going to
look at it and say, 'You knew all this and you still deported him? You're
crazy.'"

POSTED BY JACQUELINE STEVENS AT 08:28   3 COMMENTS:
   LINKS TO THIS POST   ✉

LABELS: ATLANTA IMMIGRATION COURT, CITIZENSHIP, DEPORTATION, ICE,
ICE DEPORTING US CITIZENS, MARK LYTTLE

---

                    Home                        Older Posts

Subscribe to: Posts (Atom)

                    MORE ON STATES WITHOUT NATIONS

        •              AGORAXCHANGE
        •           AUTHOR HOMEPAGE

                    #End read more